**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JONES ONWENU,

      Plaintiff,

v.

JOSEPH BACIGAL, *et al.*,

      Defendants.

Case No. 18-cv-10980
Hon. Matthew F. Leitman

_____/

### OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 11)

In the early morning hours of March 27, 2016, Defendant Joseph Bacigal, a West Bloomfield police officer, observed a 1994 Dodge Stealth (1) come to a complete stop at a flashing yellow light and (2) twice pull off to the side of the road and then back into the lane of traffic. Bacigal initiated a traffic stop because he suspected that the driver of the vehicle – who turned out to be Plaintiff Jones Onwenu – may have been driving while impaired by alcohol. During the stop, Onwenu engaged in conduct that further suggested that he may have been under the influence of alcohol. For example, Onwenu first denied and then admitted that he had consumed alcohol earlier in the evening, interrupted Bacigal, provided numerous non-responsive answers to Bacigal's questions, attempted to drive off while Bacigal still had his (Onwenu's) driver's license, and failed to complete a preliminary breath

test despite being given eight opportunities to blow enough air into the testing device. Based upon Onwenu's driving and behavior during the stop, Bacigal arrested Onwenu for operating his motor vehicle while under the influence of alcohol.

It turns out that Onwenu was not under the influence of alcohol. A test of Onwenu's blood conducted later that morning revealed that he had no alcohol in his system. Thus, we now know that what appeared to be possible drunk driving by Onwenu was actually Onwenu exercising an unusual level of caution (by stopping a flashing yellow light) and courtesy (by pulling over in an attempt to allow Bacigal to pass). Likewise, in hindsight, we now know that Onwenu's agitation and apparent confusion during the stop did not result from his consumption alcohol but, instead, stemmed primarily from his extreme frustration with the fact that Bacigal was investigating him for a crime – drunk driving – that he had not committed. In this action, Onwenu alleges, among other things, that Bacigal violated his (Onwenu's) Fourth Amendment rights when Bacigal arrested him for drunk driving even though he was sober.

The problem for Onwenu is that the Court does not assess Bacigal's actions from the perspective of hindsight. Instead, because Bacigal has asserted a qualified immunity defense, the Court must ask whether Bacigal could reasonably, even if mistakenly, have concluded that there was probable cause to arrest Onwenu for

drunk driving. For the reasons explained in more detail below, the Court concludes that Onwenu's irregular driving and his behavior during the traffic stop, taken together, supported a reasonable – even if mistaken – belief by Bacigal that Onwenu had been driving while intoxicated. Thus, Bacigal is entitled to qualified immunity from Onwenu's wrongful arrest claim. In addition, as further explained below, Bacigal is also entitled to qualify immunity from Onwenu's claim that Bacigal applied handcuffs too tightly during the arrest and from Onwenu's claim that Bacigal made false statements in an affidavit seeking a search warrant for Onwenu's blood. Moreover, West Bloomfield Township is entitled to summary judgment on Onwenu's municipal liability claim. Accordingly, the Court will **GRANT** the motion for summary judgment filed by Bacigal and West Bloomfield. (*See* Mot., ECF No. 11.)

## I

Many of the background facts that led to Onwenu's arrest are undisputed. In addition, nearly the entire episode was captured on Bacigal's dash-cam video, which is included in the record. (*See* ECF No. 11-4.) The facts are as follows.

### A

At nearly 3:00 a.m. on the morning of March 27, 2016, Onwenu was driving eastbound on Walnut Lake Road in West Bloomfield. (*See* Onwenu Dep. at 39-41, ECF No. 15-10, PageID.268; Bacigal Dep. at 56-57, ECF No. 15-11, PageID.299.)

Onwenu arrived at an intersection where the traffic light in his direction was flashing yellow. (*See* Bacigal Dep. at 57, ECF No. 15-11, PageID.299.) Under Michigan law, a driver who encounters a flashing yellow light should "proceed through the intersection … with caution." Mich. Comp. Laws. § 257.614(1)(b). Onwenu did not "proceed through the intersection." *Id.* Instead, he came to a complete stop at the flashing yellow light. (*See* Bacigal Dep. at 57-58, ECF No. 15-11, PageID.299-300.) Onwenu remained stopped at the flashing yellow light long "[e]nough to draw [the] attention" of Bacigal, who had approached the same intersection from the north. (*Id.* at 58, PageID.300.)

Onwenu then began travelling "slow[ly]" eastbound on Walnut Lake Road. (*Id.* at 67, PageID.302.) Bacigal turned and began following behind Onwenu, but Bacigal did not activate his police lights or initiate a traffic stop at that time. (*See id.*; *see also* Onwenu Dep. at 44-45, ECF No. 15-10, PageID.269.) Once Bacigal began following Onwenu, Onwenu pulled off into a "flare" lane and stopped his vehicle on the righthand side of the road. (Bacigal Dep. at 67, ECF No. 15-11, PageID.302.) Onwenu says that he did so in order to "get out of the way" so that Bacigal could pass him. (Onwenu Dep. at 44, ECF No. 15-10, PageID.269.) But Bacigal had not done anything to indicate that he wished to pass, and he did not pass Onwenu. Onwenu then pulled back into the lane of traffic in front of Bacigal. (*See id.*) About "half a block later," Onwenu pulled to the side of the road for a second

time. (*Id.*)  Onwenu says he again pulled over to "clear" a path for Bacigal (even though Bacigal again had not done anything to indicate that he needed or desired a path forward). (*Id.*)  But Bacigal again remained behind Onwenu and did not pass. (*See id.*)  Onwenu then pulled back into the lane of traffic, and at that point Bacigal initiated a traffic stop.  (*See id.* at 44-45, PageID.269.)  Onwenu then pulled over onto the right shoulder. (*See id.*)

**B**

Bacigal began the traffic stop by asking Onwenu where he was coming from. Onwenu said that he had been at his brother's house. (*See* Stop Tr., ECF No. 21, PageID.353.[1])  Bacigal then asked what Onwenu was doing at his brother's house, and Onwenu answered that he was "just talking." (*Id.*)

Bacigal then told Onwenu that he initiated the traffic stop because Onwenu was driving "really slow" and "swerv[ing] to the right and then [] back over" before again "dropp[ing] back over to the right." (*Id.*, PageID.354.)  Onwenu responded that the "reason [he] pulled over" was because he saw Bacigal and "thought [Bacigal] planned to [pass] him." (*Id.*)

---

[1] The transcript of the stop in the record was prepared by the parties at the request of the Court.  The transcript is comprised of the period from the start of the stop through Onwenu's arrival at the West Bloomfield police station.  It is not a transcript of the entirety of the dash-cam video included in the record (which includes the period after Onwenu arrived at the station).

Bacigal then asked Onwenu if Onwenu had been "drinking at [his] brother's [house]." (*Id.*) Onwenu answered "[n]o, I said we had a family discussion." (*Id.*) Bacigal then asked Onwenu a second time if Onwenu had anything to drink "at all," and Onwenu again said that he had a "family discussion." (*Id.*, PageID.354-355.) Finally, Bacigal asked Onwenu a third time if he had anything to drink. (*See id.*, PageID.355.) Onwenu then admitted that he "had a drink [a] 9 o'clock," which Onwenu said was "three hours ago." (*Id.*) But as noted above, Bacigal initiated the traffic stop at roughly 3:00 a.m., and thus it had been nearly six hours since "9 o'clock."

Bacigal says that when he spoke with Onwenu, he observed that Onwenu's "eyes were glassy" and that his "speech was slurred," and Bacigal claims that he could "smell the odor of intoxicants emanating from [Onwenu's] body." (Police Rpt., ECF No. 11-3, PageID.110.) Onwenu denies that he exhibited these signs of intoxication.

After the initial conversation between Bacigal and Onwenu, Onwenu handed Bacigal his driver's license and vehicle registration. Onwenu then told Bacigal that he had planned to "turn on[to] Farmington [Road]." (Stop Tr., ECF No. 21, PageID.355.) Bacigal said "okay" and began walking back towards his police car with Onwenu's license and registration in hand. (*Id.*) At that point, Onwenu put his car in gear and began to drive away. When Bacigal yelled for Onwenu to stop,

Onwenu did so. (*See id.*) Bacigal asked Onwenu why he started driving, and Onwenu responded "I thought you said go." (*Id.*) Bacigal reminded Onwenu that Bacigal still had Onwenu's driver's license, and he instructed Onwenu to turn his car off. (*See id.*) At or around this same time, Bacigal called for backup, and additional officers later arrived on the scene.

Bacigal next asked Onwenu to exit the vehicle, and Bacigal told Onwenu that he was going to administer some field sobriety "tests." (*Id.*, PageID.356.) Onwenu then told Bacigal that he had had a "stroke" and that his "leg was not good." (*Id.*) Bacigal assured Onwenu that "we're not going to make you do any walking tests or anything like that because of your bad leg." (*Id.*, PageID.357.) Even though Bacigal told Onwenu that Onwenu would not need to do any walking tests, Onwenu continued to tell Bacigal that his leg was "bad" and that he had "disability papers" to substantiate his disability. (*Id.*; *see also id.*, PageID.358.)

Bacigal then administered what is known as a "horizontal nystagmus" test to Onwenu. (*See id.*, PageID.358.) In this test, an officer instructs a suspect to follow the officer's finger without moving the suspect's head. Bacigal told Onwenuu to "follow the tip of [Bacigal's] finger with [Onwenu's] eyes and just [Onwenu's] eyes." (*Id.*) He then instructed Onwenu not to "move [his] head at all." (*Id.*) While administering the test, Bacigal repeatedly instructed Onwenu not to move his head. (*See id.*, PageID.358-359.) Onwenu responded that he was not moving his head and

that the lights from Bacigal's police car were "shining in [his] face." (*Id.*, PageID.359.) Bacigal concluded that Onwenu had failed the nystagmus test. (*See id.*, PageID.370.)

Bacigal next tried to administer a preliminary breathalyzer test ("PBT") by having Onwenu blow air into a portable breathalyzer device. (*See id.*, PageID.360.) Bacigal instructed Onwenu to "blow it up like [he was] blowing a balloon." (*Id.*) Onwenu failed to blow sufficient breath into the device on his first attempt. (*See id.*) Bacigal then told Onwenu that he "needed to blow more than that," and Bacigal explained that Onwenu needed to "put [his] lips around [the device]" and "blow into it [] like [] blowing a balloon." (*Id.*, PageID.360-361.) Onwenu failed to blow enough breath on his second attempt. (*See id.*, PageID.361.) Bacigal then told Onwenu that he saw Onwenu "putting [his] lips over the [device]" and not around the device and that Onwenu was not taking the test correctly. (*Id.*)

Around this time, Onwenu became upset and told Bacigal that he did not "like the way [Bacigal was] treating [him]." (*Id.*) Onwenu also said that he felt like Bacigal was treating him like a "criminal" and that if Bacigal wanted to "check [his] record" Bacigal could "check." (*Id.*) Bacigal responded by explaining that he did not want to check Onwenu's record; he wanted to check Onwenu's "breath." (*Id.*, PageID.361-362.) When Onwenu said he "already" blew into the machine, Bacigal

said "[n]o, you didn't. You put your lips in front of the tube and pretended to blow." (*Id.*, PageID.362.)

Importantly, Bacigal confirmed on the scene that Onwenu had the physical capability to take the breathalyzer test. To do that, Bacigal set the breathalyzer device aside, asked Onwenu to "look at me," and physically demonstrated how to blow out enough air to complete the test. (*Id.*) Bacigal then told Onwenu: "You need to put your lips around the tube, okay. We're going to put [your lips] around the tube, not in front of [the tube], and we're going to blow long and steady." (*Id.*) Finally, Bacigal asked Onwenu if Onwenu could exhale like Bacigal had just demonstrated. (*See id.*) Bacigal then watched as Onwenu showed how much air he could exhale. (*See id.*, PageID.362-363; *see also* Stop Video, ECF No. 11-4.) Bacigal determined that Onwenu had blown enough air to complete the test, and Bacigal told Onwenu that he should blow like "that" when given another chance to take the test. (Stop Tr., ECF No. 21, PageID.363.) Bacigal immediately thereafter gave Onwenu another opportunity to take the PBT, but Onwenu again failed to blow enough air into the machine. (*See id.*)

At this point, Onwenu began repeating his complaints about how he was being treated. He said that he did not "understand" why there were so many officers on the scene, said he was not "harassing" the officers, and pointed out that he was "licensed by the State of Michigan as a counselor." (*Id.*, PageID.363.) Onwenu and

Bacigal then disagreed about whether Onwenu had completed the PBT:

> ONWENU: So you asked me to blow, I blow for you. [….]
>
> BACIGAL: Sir, you haven't blown at all. You keep putting your lips in front of the tube.
>
> [….]
>
> ONWENU: I will blow for you, I will blow for you, I have no problem.
>
> BACIGAL: Okay, let's do that. No, no, no, no, no, put your lips around the tube.
>
> ONWENU: Around this?
>
> BACIGAL: Around the tube. Put your lips around the tube like a straw. Now blow in. Sir, you have to blow in. I know what you're trying –
>
> ONWENU: I'm blowing. I'm blowing. Why do I tell you the truth, you wouldn't even take it?
>
> BACIGAL: Sir, please blow into the tube.
>
> ONWENU: [….] Why you punishing me? I'm not a criminal.
>
> BACIGAL: Sir, I'm not –
>
> ONWENU: I haven't done anything wrong.
>
> BACIGAL: Sir, I don't want to punish you. I want to make sure you're being safe. Your driving was very unsafe.

(*Id.* PageID.363-365.)

Shortly thereafter, Bacigal had a second officer attempt to administer the PBT to Onwenu.  Bacigal told Onwenu that if he did not provide a valid sample, he (Bacigal) would arrest Onwenu.  Onwenu continued to interrupt Bacigal and provide non-responsive answers to Bacigal's request that Onwenu take the PBT:

BACIGAL:  I'm going to give you one more chance –

ONWENU:  That's fine

BACIGAL:  – to actually blow into this.

ONWENU:  I will blow if you want me to blow.

BACIGAL:  Listen, if you don't – this is the last chance – If you –

ONWENU:  I'm not understanding.  [You] want to lock me up, because I'm in Bloomfield?

BACIGAL: Listen, you have to –

ONWENU:  I've lived in Detroit for 30 years.

BACIGAL: You have to listen to me.

ONWENU:  Why are you punishing me? I have a [counseling] license from the State of Michigan.

BACIGAL:  Sir, listen.

ONWENU:  I'm a counselor, so understand that because you're holding me and making me look bad.  I have a state license and I can call for it and show you.

BACIGAL:  Listen.  You will get one more chance at this test.  If you do not do it correctly the way I've instructed you –

ONWENU: I have no problem blowing something.

BACIGAL: – I will arrest you.

(*Id.* PageID.370-371.)

Bacigal then instructed Onwenu to "[t]ake a long deep breath, long and deep" (*Id.*, PageID.371), and Bacigal gave Onwenu one last opportunity to take the test. Bacigal then observed Onwenu "putting [his] lips in front of the [tube] again" and not breathing into the tube. (*Id.*) Bacigal thereafter placed Onwenu under arrest and handcuffed him. (*See id.*, PageID.372.)

## C

After Bacigal handcuffed Onwenu, Bacigal placed Onwenu in the back of a police car. (*See id.*, PageID.374-377.) Onwenu repeatedly told Bacigal that he couldn't move his leg and that there was not room for him to sit in the backseat of the car. (*See id.*) Onwenu also began screaming. (*See id.,* PageID.376-377.) Bacigal heard the screaming and asked Onwenu what was wrong. (*See id.*, PageID.377.) Onwenu responded that his handcuffs were too tight. (*See id.*) Bacigal then said that he "can check that," and he asked Onwenu to "sit up" so that he (Bacigal) could "check [the handcuffs]." (*Id.*) Onwenu then yelled, "I cannot sit down, I'm really dying …. Oh, my God, oh, my God. I'm dying, please." (*Id.*) Bacigal repeatedly attempted to calm Onwenu down, and Bacigal assured Onwenu that he (Bacigal) would check the handcuffs if Onwenu would stop yelling. (*See id.*)

Bacigal then checked Onwenu's handcuffs and confirmed they were not too tight. (*See* Stop Video, ECF No. 11-4.) More specifically, Bacigal climbed into the backseat of the police car, visually inspected the cuffs, and confirmed that there was space between the cuffs and Onwenu's wrists. (*See id.*; *see also* Stop Tr., ECF No. 21, PageID.377-378.) Bacigal told Onwenu that "I can see [the handcuffs and] there's room." (Stop Tr., ECF No. 21, PageID.378.) Bacigal also assured Onwenu that "we're going to take you back [to the police station] and we'll get the[] cuffs off" and that the cuffs would be "off soon." (*Id.*)

Bacigal then drove Onwenu a short distance to the West Bloomfield Police Station. (*See id.*) The drive took less than three minutes. Onwenu yelled throughout the duration of the drive. (*See id.*; *see also* Strop Video, ECF No. 11-4.) Once Bacigal arrived at the police station, he told Onwenu that he was "going to get those cuffs off." (Stop Tr., ECF No. 21, PageID.378.) Onwenu then continued yelling and insisted that the police were "going to kill [him]." (*Id.*, PageID.379.) Onwenu also had a difficult time catching his breath and claimed that he was having a heart attack. (*See id.*, PageID.379-380.) Onwenu then began vomiting. At around that same time, Onwenu's handcuffs were removed and a medic was called to examine Onwenu. (*See id.*, PageID.380-381.)

Onwenu eventually calmed down, and Bacigal and other officers again attempted to have Onwenu take a breath test (on a datamaster machine housed in the station). But the officers could not obtain a valid breath sample from Onwenu because he again failed to blow enough air.[2] Bacigal then drafted an affidavit for a search warrant so that he could obtain a blood sample from Onwenu. (*See* Affidavit, ECF No. 15-2.) Bacigal explained his justification for the warrant as follows:

> Affiant observed the said described person driving in the following manner: I was NIB on Drake Rd stopped for the traffic signal, which was blinking red for Drake, when I observed Onwenu driving at a very slow rate of speed. Onwenu was driving E/8 on Walnut Lake Rd West of Drake in a vehicle bearing MI license plate number DAS2018. Onwenu then stopped at the intersection, which was blinking yellow for Walnut Lake Rd. I let Onwenu proceed through the intersection and turned behind him. As I turned Onwenu changed lanes into the flare lane and stopped. I stopped my vehicle and Onwenu began to drive once again, merging back into the lane of traffic. Onwenu continued to drive approximately 15-20 mph under the speed limit. I continued to follow him and he once again merged into the flare lane and stopped. I then initiated a traffic stop at Walnut Lake and Beauchamp Place Dr. When I initiated the traffic stop, Onwenu pulled far to the

---

[2] When the officers attempted to have Onwenu take a breath test at the police station, Onwenu told the officers that his medical conditions prevented him from exhaling enough air to take the test. (*See* Police Rpt., ECF No. 11-3, Page ID.113.) One of the officers in the station (not Bacigal), then "requested that [Onwenu] take a deep breathe [sic] and exhale onto [the officer's] hand in order to gauge the volume of air he was able to move." (*Id.*) That officer was "satisfied" that, based on the amount of air that Onwenu exhaled, Onwenu had the physical capability to take the test. (*Id.*)

right, almost completely off the shoulder of the road and over a grass berm.

Said described person had an odor of intoxicants emanating from his breath.

Affiant personally observed the said described person to have As I spoke with Onwenu, his eyes were glassy and speech was slurred. Onwenu stated that he had been drinking earlier that night, but had not drank in several hours. Onwenu repeatedly asked why he was stopped and seemed to forget my answers. Onwenu attempted to leave the traffic stop after giving me his license, because he thought the traffic stop was over. Onwenu was argumentative, repetitive, and belligerent when trying to speak with him.

Affiant personally observed said described person perform sobriety tasks with the following results:

a. One Leg Stand: I was unable to perform this test due to a knee injury.
b. Heel/Toe Walk: I was unable to perform this test due to a knee injury.
c. Horizontal Gaze Nystagmus: I explained the test to Onwenu, and he stated that he understood. I had to remind him several times to not move his head during the test I also observed the onset of nystagmus at 45 degrees with distinct and sustained nystagmus at maximum deviation.
d. Alphabet I was unable to perform this test due Onwenu's demeanor and state
e. Counting: I was unable to perform this test due Onwenu's demeanor and state.

Said described person's preliminary breath test results: Refused.

(*Id.*, PageID.225-226.)  Bacigal also completed a form that documented Onwenu's

"refusal" to submit to a breathalyzer test. (*See* ECF No. 15-4.)   That form was

submitted to the Michigan Secretary of State as required by Michigan law. *See* Mich. Comp. Laws § 257.625d(2).

The results of the test on the blood drawn from Onwenu later showed that Onwenu did not have any alcohol or other drugs in his system at the time of the test. (*See* ECF No. 15-5.)

## II

Onwenu filed this action against Bacigal and the Township of West Bloomfield on March 26, 2018. (*See* Compl., ECF No. 1.) Onwenu brings five constitutional claims against the Defendants pursuant to 42 U.S.C. § 1983. (*See id.*)

First, Onwenu claims that Bacigal's "actions in arresting [] Onwenu for operating a motor vehicle while intoxicated absent probable cause … resulted in a false arrest and false imprisonment." (*Id.* at ¶20, PageID.4.) Second, Onwenu alleges that Bacigal's "actions in attesting as affiant to objectively false information, *i.e.* Onwenu's alleged refusal to perform PBT testing, resulted in an unlawful search warrant and unreasonable seizure of plaintiff's blood in violation of clearly established rights under the Fourth Amendment of United States Constitution." (*Id.* at ¶21, PageID.4.) Third, Onwenu asserts that "Bacigal's actions in falsely reporting to the Michigan Secretary of State objectively false information, *i.e.* Onwenu's alleged refusal to perform PBT testing, resulted in an unlawful suspension of plaintiff's driving privileges in violation of clearly established rights under the

Fourth Amendment of United States Constitution." (*Id.* at ¶22, PageID.4.) Fourth, Onwenu claims that "Bacigal's use of excessive handcuffing under the totality of circumstances, including his actual knowledge of Onwenu's complaints of excruciating wrist injury and despite multiple requests to loosen the cuffs constitutes unreasonable seizure under the Fourth Amendment of United States Constitution." (*Id.* at ¶23, PageID.4.) Finally, Onwenu alleges that "the policies, practices and customs of West Bloomfield Township were the moving force behind the violation of [his] civil rights." (*Id.* at ¶33, PageID.6.)

Bacigal and West Bloomfield moved for summary judgment on March 15, 2019. (*See* Mot., ECF No. 11.) In the motion, Bacigal argued, among other things, that he is entitled to qualified immunity, and West Bloomfield contended that Onwenu had failed to establish a basis for municipal liability. The Court held a hearing on the motion on October 3, 2019. (*See* Notice of Hearing, ECF No. 20.)

### III

The summary judgment standard and its application in the qualified immunity context are well-established. A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable

to the non-moving party and draw all reasonable inferences in its favor." *Id.* "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson*, 477 U.S. at 252. Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251-52. "Credibility determinations, the weighing of the evidence, and the drafting of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255.

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Green v. Throckmorton*, 681 F.3d 853, 864 (6th Cir. 2012) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "Once raised, it is the plaintiff's burden to show that the defendant[] [is] not entitled to qualified immunity." *Kinlin v. Kline*, 749 F.3d 573, 577 (6th Cir. 2014).

The United States Court of Appeals for the Sixth Circuit "has generally used a two-step [qualified immunity] analysis: (1) viewing the facts in the light most favorable to the plaintiff, [the court] determines whether the allegations give rise to a constitutional violation; and (2) [the court] assesses whether the right was clearly established at the time of the incident." *Id.* (internal punctuation omitted). "[U]nder

either prong [of this inquiry], courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).

## IV

## A

The Court begins with Onwenu's claim that Bacigal arrested him without probable cause in violation of the Fourth Amendment. Bacigal responds that he is entitled to summary judgment on this claim based upon qualified immunity. The Court agrees.

In assessing Bacigal's qualified immunity defense, the question is not whether he actually had probable cause to arrest Onwenu. Indeed, a "lack of probable cause is not necessarily fatal to an officer's defense against civil liability for false arrest. Rather, an officer is entitled to qualified immunity under § 1983 if he or she could reasonably (even if erroneously) have believed the arrest was lawful in light of clearly established law and the information possessed at the time." *Green*, 681 F.3d at 865.[3] Onwenu has failed to show that Bacigal's probable cause determination,

---

[3] *See also Kennedy v. City of Villa Hills*, 635 F.3d 210, 214 (6th Cir. 2011) ("Thus, even if a factual dispute exists about the objective reasonableness of the officer's actions, a court should grant the officer qualified immunity if, viewing the facts favorably to the plaintiff, an officer reasonably could have believed that the arrest was lawful.").

even if wrong, was unreasonable. Bacigal is therefore entitled to qualified immunity on Onwenu's false arrest claim.

"Probable cause to make an arrest exists if, at the moment of the arrest, the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the arrestee had committed or was committing an offense." *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001) (internal punctuation omitted). Moreover, "[p]robable cause is assessed from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (internal quotation marks omitted). And the "probable cause requirement 'does not demand any showing that such a belief is correct or more likely true than false.'" *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1508 (6th Cir. 1988) (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)); *see also United States v. Campbell*, 486 F.3d 949, 955 (6th Cir. 2009) (same).

Here, the following facts known to Bacigal, taken together, are sufficient to support a reasonable (even if mistaken) belief that there was probable cause to arrest Onwenu for driving while intoxicated:

- Onwenu's driving was irregular and did not comply with traffic laws (*i.e.*, Onwenu stopped his vehicle at a flashing yellow light, and he twice pulled over to the side of the road to clear a path for Bacigal to pass him even though Bacigal had given no indication that he desired to pass);

- Onwenu admitted that he had consumed alcohol earlier in the evening;

- Onwenu's story about whether he had consumed alcohol that night changed during the stop. Onwenu twice denied that he had consumed alcohol before finally admitting that he had done so;

- When Onwenu did admit to consuming alcohol, he told Bacigal that he had a drink "three hours ago" at "9 o'clock," but at the time Onwenu made that statement, it was nearly 3:00 a.m. – six hours past "9 o'clock"[4];

- Onwenu attempted to drive away in the middle of the stop;

- Onwenu provided many non-responsive answers to Bacigal's questions;

- Onwenu frequently repeated himself while speaking with Bacigal, constantly interrupted Bacigal, and was argumentative throughout the encounter;[5] and

---

[4] Bacigal recognized this discrepancy and noted it in his police report. (*See* Police Rpt., ECF No. 11-3, PageID.110.)

[5] As noted above, in hindsight, we know that this behavior by Onwenu was not caused by his consumption of alcohol, but, instead, resulted primarily from his extreme frustration with being investigated for a crime – drunk driving – that he knew he had not committed. Onwenu's strong reaction to Bacigal also seems to have stemmed in part from his (Onwenu's) concern that he may have been the victim of racial profiling. Onwenu's strong feelings during the stop are understandable. Indeed, it seems natural that a driver in Onwenu's position would experience anxiety and agitation when erroneously suspected of drunk driving. Moreover, even though there is absolutely no evidence that Bacigal engaged in any racial profiling (and based upon the Court's review of the video, the Court is persuaded that no racial profiling occurred here), in this day and age, Onwenu's concern that such profiling may have occurred is easy to understand. But the question here is not whether Onwenu's feelings and reactions were understandable under the circumstances. The question is whether, under all of the circumstances, Bacigal could reasonably, even if erroneously, have concluded that Onwenu's behavior, together with his driving,

- Onwenu failed to provide a valid breath sample even though Bacigal gave him roughly eight opportunities to do so and even though – as he had demonstrated to Bacigal during the stop – he had the physical ability to exhale enough air to register a valid sample.[6]

Based on the totality of these facts, Bacigal could have reasonably, even if erroneously, concluded that Onwenu had been driving while intoxicated. *See*, *e.g.*, *United States v. Romero*, 452 F.3d 610, 616 (6th Cir. 2006) ("When determining whether an arrest was supported by probable cause, we utilize a totality-of-the-

---

established probable cause that Onwenu was driving under the influence of alcohol. As explained above, the answer to that question is "yes."

[6] There are other "facts" that Bacigal says support a reasonable belief that there was probable cause to arrest Onwenu.  For example, Bacigal says that Onwenu's "eyes were glassy [and] his speech was slurred," and Bacigal says that he also "smelled intoxicants [emanating from Onwenu's body]." (Bacigal Resp. Br., ECF No.11, PageID.63.)  In addition, Bacigal points out that Onwenu "failed the nystagmus test." (*Id.*)   However, for the purposes of resolving Bacigal's motion for summary judgment on the false arrest claim, the Court will not consider any of these additional facts.  Onwenu's alleged glassy eyes, slurred speech, and odor of intoxicants are not reflected on the video of the stop.  And based on Onwenu's blood test showing a 0.00 blood-alcohol level, a jury could reasonably disbelieve Bacigal's claim that these conditions existed at the time of the stop. *See*, *e.g*., *Green*, 681 F.3d at 862-63 (finding "persuasive" argument that clean blood test "called into question" officer's observation that the plaintiff's pupils were "constricted" and finding credibility question for the jury).   In addition, a jury could reasonably disregard the results of the nystagmus test because, as the video reveals, the headlights of Onwenu's vehicle were shining toward Onwenu's eyes during the test.  As Bacigal acknowledged, it is preferable to perform the test without light shining in the face of the person being tested. (*See* Bacigal Dep. at 34-34, ECF No. 15-11, PageID.294.) For these reasons, the Court will not consider these additional facts when determining whether Bacigal is entitled to qualified immunity on Onwenu's false arrest claim.

circumstances approach.") (internal quotation marks omitted).  Bacigal is therefore entitled to qualified immunity on Onwenu's false arrest claim.

Onwenu counters that Bacigal is not entitled to qualified immunity for several reasons.  First, Onwenu argues that "[t]he dash cam video definitively contradicts Bacigal's version of events." (Onwenu Resp. to Mot., ECF No. 15, PageID.204-205.)  For example, Onwenu says that "the video establishes that Onwenu's driving was neither erratic nor suspicious." (*Id.*, PageID.205.)  Onwenu further argues that the video "reflects [his] cooperation at all times" and shows that he "respond[ed] to Bacigal's questioning respectfully and without rancor." (*Id.*)  Finally, Onwenu insists that "[t]he video also establishes Onwenu's cooperation with the PBT test." (*Id.*, PageID.206.)

The Court disagrees.  It has carefully reviewed the dash-cam video of the traffic stop multiple times.  As described above, the video clearly shows Onwenu driving in an irregular manner, changing his story about whether he had been drinking, and acting in an argumentative and non-responsive manner to Bacigal's questions.  It also shows that Onwenu had the physical capability to provide a sample for the PBT but failed to do so.  And while Onwenu attempts to pick apart various individual segments of the stop as depicted in the video, the video shows that, under the totality of the circumstances, Bacigal could reasonably (even if erroneously) have determined that Onwenu was intoxicated.

Second, Onwenu argues that "Bacigal failed … to consider exculpatory evidence" before Bacigal arrested Onwenu. (*Id.*, PageID.206-207.) More specifically, Onwenu says that Bacigal "exclude[d] consideration of readily available exculpatory evidence including multiple infirmities affecting Onwenu's ability to perform breathing tests." (*Id.*, PageID.207.) But as the video of the stop makes clear, prior to Onwenu's arrest, Onwenu never told Bacigal or the other officers that his health conditions prevented him from taking the PBT.[7] On the contrary, Onwenu repeatedly told Bacigal that he *would* take the test. And importantly, Bacigal confirmed, prior to Onwenu's arrest, that Onwenu *did* have the capacity to blow enough air to provide a valid sample. Finally, while Onwenu is correct that he did not verbally refuse to take the test, he nevertheless failed to provide a valid sample despite several opportunities to do so. Simply put, the record does not support Onwenu's contention that Bacigal ignored exculpatory information before Bacigal arrested Onwenu. On the contrary, based upon all of the facts known

---

[7] In Onwenu's response to the motion for summary judgment, he notes that, after his arrest, when he was at the police station, he told officers that his medical conditions prevented him from "blow[ing] for an extended period of time." (Onwenu Resp. to Mot., ECF No. 15, PageID.206; quoting Police Rpt., ECF No. 11-3, Page ID.113.) But as explained in footnote two above, when Onwenu told officers at the station about his medical condition, an officer had Onwenu exhale air onto the officer's hand to determine if Onwenu was physically capable of blowing enough air to take the test, and, like Bacigal on the scene, the officer at the station was "satisfied" that Onwenu was physically capable of taking the test. (Police Rpt., ECF No. 11-3, PageID.113.)

to him, Bacigal reasonably concluded that Onwenu was physically capable of providing a valid breath sample but was deliberately failing to do so.

## B

The Court next turns to Onwenu's claim that Bacigal made false statements in the search warrant affidavit and that those statements led to an unlawful seizure of his blood. (*See* Compl., ECF No. 1, PageID.4.) According to Onwenu, "Officer Bacigal's affidavit falsely stated that Onwenu appeared intoxicated, with glassy eyes and slurped speech." (Onwenu Resp. Br., ECF No. 15, PageID.216-217.) Onwenu also contends that Bacigal's statement in the affidavit that he could smell the "odor of intoxicants emanating from [Onwenu's] breath" was an "obvious fabrication[]." (*Id.*, PageID.200.) Bacigal responds that he is entitled to qualified immunity on this claim. (*See* Mot., ECF No. 11, PageID.64-65.) The Court agrees.

"In § 1983 actions, an officer ordinarily receives qualified immunity if he or she relies on a judicially secured warrant." *Hale v. Kart*, 396 F.3d 721, 725 (6th Cir. 2005). "However, 'an officer cannot rely on the judicial determination of probable cause if that officer knowingly makes false statements and omissions' that are necessary to find probable cause." *Wolgast v. Richards*, 389 F. App'x 494, 501-02 (6th Cir. 2010) (quoting *Yancey v. Carroll County, Ky.*, 876 F.2d 1238, 1243 (6th Cir. 1989)). As the Sixth Circuit has explained:

An action under § 1983 does lie against an officer who obtains an invalid search warrant by making, in his affidavit, material false statements either knowingly or in reckless disregard for the truth. This standard originates in *Franks v. Delaware,* 438 U.S. 154 […], a suppression case in which the Supreme Court defined the Fourth Amendment's guarantee in the context of search warrants issued on the basis of false affidavits: only if "a false statement [was made] knowingly and intentionally, or with reckless disregard for the truth" and if, "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause," is there a constitutional violation under the Fourth Amendment. *Id.* at 155-56, 98 S.Ct. at 2676.

*Id.* at 502 (quoting *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989); internal citation omitted); *see also Hinchman v. Moore*, 312 F.3d 196, 206 (6th Cir. 2002) ("[O]nly if a false statement was made knowingly and intentionally, or with reckless disregard for the truth and if, with the officer's false material set to one side, the defendant's conduct is insufficient to establish probable cause, is there a constitutional violation under the Fourth Amendment." (internal punctuation omitted)).

Here, Onwenu's claim against Bacigal based upon the allegedly false statements in the search warrant affidavit fails because the affidavit established probable cause to believe that Onwenu had committed a drinking and driving offense even without those statements. In addition to the allegedly false statements, Bacigal's affidavit asserted that Onwenu *admitted drinking alcohol earlier in the evening* and that he:

- Came to a complete stop at a flashing yellow light;

- Twice "changed lanes into the flare land and stopped" before "merging back into the lane of traffic";

- Drove 15-to-20 miles per hour below the posted speed limit;

- "[R]epeatedly asked why he was stopped and seemed to forget [Bacigal's] answers";

- "[A]ttempted to leave the traffic stop after giving [Bacigal] his license[] because [Onwenu] thought the traffic stop was over";

- Was "argumentative, repetitive, and belligerent when trying to speak with him;[8] and

- "Refused" to take a PBT.[9]

(Affidavit, ECF No. 15-2, PageID.225-226.)

---

[8] The Court does not agree with Bacigal's description of Onwenu as "belligerent." Onwenu was non-responsive, repetitive, and, at times, argumentative. But he was not belligerent. However, Bacigal's use of the word "belligerent" is not so off the mark as to meaningfully change the probable cause analysis.

[9] In *Bailey v. City of Howell*, 643 F. App'x 589, 595-96 (6th Cir. 2016), the Sixth Circuit identified a driver's refusal to take a PBT as one factor that was properly considered in determining whether there was probable cause to arrest the driver for driving while intoxicated under Michigan law. And in *Kinlin*, 749 F.3d at 580, the Sixth Circuit cited with approval the Eleventh Circuit's decision in *Miller v. Harget*, 458 F.3d 1251, 1260 (11th Cir. 2006), in which the Eleventh Circuit held that a refusal to take a PBT is one factor that may be considered in determining whether there was probable cause to arrest a driver for drunk driving.

These facts, when considered in their totality, are sufficient to establish probable cause to believe that Onwenu committed a drinking and driving offense under Michigan law. *See*, *e.g.*, Mich. Comp. Laws 257.625(1) & (3). Bacigal is therefore entitled to summary judgment with respect to Onwenu's claim based upon the search warrant affidavit.

C

Onwenu next claims that Bacigal subjected him to excessively tight handcuffing in violation of the Fourth Amendment. (*See* Onwenu Resp. Br., ECF No. 15, PageID.209-216.) Bacigal responds that he is entitled to qualified immunity with respect to this claim. The Court agrees.

"The Fourth Amendment prohibits excessive force when arresting someone, which includes unduly tight handcuffing." *Rudolph v. Babinec*, --- F.3d ---, 2019 WL 4559351, at *5 (6th Cir. Sept., 20, 2019) (internal quotation marks omitted). "In order for a handcuffing claim to survive summary judgment, a plaintiff must offer sufficient evidence to create a genuine issue of material fact that: (1) he or she complained that the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced some physical injury resulting from the handcuffing." *Miller v. Sanilac County*, 606 F.3d 240, 252 (6th Cir. 2010) (internal quotation marks omitted).

Onwenu has failed to present sufficient evidence to establish his handcuffing claim. There is no dispute that Onwenu complained that the handcuffs were too tight. And the Court will assume without deciding that Onwenu suffered a wrist injury as a result of the allegedly tight cuffing. Thus, Onwenu's claim comes down to whether Bacigal ignored Onwenu's complaints about the handcuffs. He did not.

The video of the traffic stop clearly shows that after Onwenu complained that the handcuffs were causing him pain, Bacigal visually inspected the handcuffs and determined that there was sufficient space between the cuffs and Onwenu's wrists. Bacigal also repeatedly told Onwenu that he would take the cuffs off as soon as they arrived at the police station (which was less than a five-minute drive away). Indeed, even Onwenu acknowledges that "Bacigal … respond[ed] to Onwenu's complaints [about the handcuffs]." (Onwenu Resp. Br., ECF No. 15, PageID.212.) And Onwenu has not provided any authority for the proposition that an officer "ignores" a suspect's complaints where the officer, like Bacigal here, (1) checks the handcuffs, (2) satisfies himself that the cuffs are not too tight, and (3) repeatedly tells the suspect that the cuffs will be removed shortly.

Finally, Onwenu's reliance on *Baynes v. Cleveland*, 799 F.3d 600 (6th Cir. 2015) is misplaced. In *Baynes*, the Sixth Circuit held that two defendant police deputies were not entitled to summary judgment on plaintiff's handcuffing claim where the deputies were "dismissive" of and "essentially non-responsive" to the

plaintiff's complaints that the handcuffs were too tight. *Id.* at 609. Here, the video of the stop belies any claim that Bacigal was "dismissive" to Onwenu's complaints about the handcuffs or that Bacigal "was essentially non-responsive." (*See* Stop Video, ECF No. 11-4.) As described above, the video clearly shows Bacigal climbing into the backseat of the police car where Onwenu was seated and visually inspecting the handcuffs to determine whether they were too tight. *Baynes* therefore does not support Onwenu's handcuffing claim.

For all of these reasons, Bacigal is entitled to summary judgment on Onwenu's claim of excessive force.

## D

Next, Onwenu claims that "Bacigal's actions in falsely reporting to the Michigan Secretary of State objectively false information, i.e. Onwenu's alleged refusal to perform PBT testing, resulted in an unlawful suspension of [Onwenu's] driving privileges." (Compl. at ¶22, ECF No. 1, PageID.4.) Bacigal asserts that he is entitled to qualified immunity with respect to this claim. (*See* Mot., ECF No. 11, PageID.73-75.) The Court agrees.

Onwenu did not directly address this argument to any substantive degree in his response to Defendants' summary judgment motion.[10]  Thus, he abandoned the claim.  As the Sixth Circuit has explained, its "jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Mich., Inc.,* 545 F. App'x 368, 372 (6th Cir. 2013) (citing cases); *see also Hicks v. Concorde Career Coll.*, 449 F. A'ppx 484, 487 (6th Cir. 2011) (holding that a district court properly declines to consider the merits of a claim when a plaintiff fails to address it in a response to a motion for summary judgment); *Clark v. City of Dublin*, 178 F. App'x 522, 524-25 (6th Cir. 2006) (same).  The Court therefore considers this claim abandoned.

In any event, even if Onwenu had presented some argument in support of this claim, the Court would still conclude that Bacigal was entitled to qualified immunity. While Onwenu did not verbally refuse to take the PBT, Bacigal could reasonably

---

[10] The only reference Onwenu makes to this claim is in the "conclusion" section of his response brief.  In that section, Onwenu says "Bacigal issued a Michigan Implied Consent Refusal resulting in suspension of Onwenu's driver's license, even though Onwenu never refused any breath test." (Onwenu Resp. Br., ECF No. 15, PageID.221.)  Onwenu does not present any argument or authority supporting this claim.  Importantly, in the section of Onwenu's brief in which he quoted the "pertinent" allegations in the Complaint, Onwenu did not quote the paragraph from the Complaint (paragraph 22) in which he alleges that Bacigal "falsely report[ed]" Onwenu's "refusal" to take the PBT. (*Id.*, PageID.202.)  Nor did Onwenu reference this claim in his table of contents or his "counter statement of issues." (*Id.*, PageID.191-192, 196.)

have concluded that Onwenu refused to take the test. Bacigal gave Onwenu multiple opportunities to provide a valid breath sample, and Onwenu demonstrated that he had the physical capacity to provide such a sample. Yet, Onwenu did not follow Bacigal's instructions about how to take the PBT, and he never provided a valid sample. Under these circumstances, Bacigal could reasonably have concluded that Onwenu deliberately refused to provide a valid sample. *See, e.g.*, *Birchfield v. North Dakota*, 136 S. Ct. 2160, 2185 (2016) (noting that "[a] breath test may also be ineffective if an arrestee deliberately attempts to prevent an accurate reading by failing to blow into the tube for the requisite length of time or with the necessary force" and that "courts have held that such conduct qualifies as a refusal to undergo testing"). Bacigal is therefore entitled to qualified immunity with respect to this claim.

## E

Finally, Onwenu seeks to hold West Bloomfield liable for Bacigal's alleged violation of his Fourth Amendment rights. It is well-settled that a governmental entity, such as the Township of West Bloomfield, cannot be held vicariously liable under 42 U.S.C. § 1983 for the acts or omissions of its employees. *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978). Rather, to hold a municipality liable under Section 1983, a plaintiff must come forward with evidence that an unconstitutional policy, custom, or practice was the proximate cause of his

injuries. *See id.* at 694. "There are at least four avenues a plaintiff may take to prove the existence of a municipality's illegal policy or custom. The plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005).

Here, Onwenu claims that West Bloomfield failed to properly train its officers how to administer a PBT and how to determine when a suspect refuses to take a PBT. (*See* Onwenu Resp. Br., ECF No. 15, PageID.218, 220.) In order to prevail on that claim, Onwenu "must prove that the training program [was] inadequate to the task an officer must perform; that the inadequacy is the result of deliberate indifference; and that the inadequacy is closely related to or actually caused [his] injury." *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *See also Brown v. Battle Creek Police Dep't*, 844 F.3d 556,

573 (6th Cir. 2016) (internal punctuation omitted) ("To establish deliberate indifference, the plaintiff must show prior instances of unconstitutional conduct demonstrating that the [City] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.").

West Bloomfield is entitled to summary judgment on Onwenu's municipal liability claim because Onwenu has failed to identify any evidence that the allegedly inadequate training resulted from West Bloomfield's deliberate indifference. For example, Onwenu has not presented any evidence of "prior instances of unconstitutional conduct" that may have put West Bloomfield on notice of a problem with its training. Nor has Onwenu identified evidence of a "pattern of similar constitutional violations by untrained employees." At most, as Onwenu asserts, there is a question regarding "*Bacigal's* competence … based on the inadequacy of [West Bloomfield's] policies and training." (Onwenu Resp. Br., ECF No. 16, PageID.220; emphasis added.) But "that a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989). Because Onwenu has not produced sufficient evidence of West Bloomfield's deliberate indifference, West Bloomfield is entitled to summary judgment on Onwenu's failure-to-train claim.

# V

For all of the reasons stated above, Defendants' motion for summary judgment (ECF No. 11) is **GRANTED**.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: November 6, 2019

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on November 6, 2019, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764